1
2
3
4                                                    O
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   CENTRAL DISTRICT OF CALIFORNIA
10
11   DANNY LEE F.,                    |   Case No. 2:19-cv-09099-KES
12              Plaintiff,            |
13        v.                          |   MEMORANDUM OPINION AND
14   ANDREW M. SAUL, Commissioner     |           ORDER
     of Social Security,             |
15                                    |
16              Defendant.            |
17
18                                    **I.**
19                    **PROCEDURAL BACKGROUND**
20        In February 2016, Plaintiff Danny Lee F. ("Plaintiff") applied for Social
21   Security Disability Insurance Benefits, alleging that he became disabled on March
22   13, 2015.[1]  Administrative Record ("AR") 189, 193.  On February 1, 2018, the
23   Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who
24   was represented by a non-attorney representative, testified along with a vocational
25   expert ("VE").  AR 33-81.
26   _____
27        [1] His previous application for benefits was denied in October 2013.  AR 83,
28   213.

On October 23, 2018, the ALJ issued an unfavorable decision.  AR 12-32. The ALJ found that Plaintiff suffered from the severe medically determinable impairments ("MDIs") of "lumbago [(i.e., lower back pain)] and status post carpal tunnel release bilaterally."  AR 18.  The ALJ determined that Plaintiff's anxiety, depression, and polysubstance abuse disorder in remission were not severe MDIs. AR 18-19.  Despite his MDIs, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except that he is "limited to frequent fine and gross manipulation bilaterally and frequent postural limitations." AR 21.

Based on this RFC and the VE's testimony, the ALJ found that Plaintiff could perform his past relevant work as a construction superintendent (DOT 182.167-026) as that job is generally performed.  AR 24-25.  The ALJ also made alternative findings that Plaintiff could work as a collator operator (DOT 208.685-010), routing clerk (DOT 222.687-022), or sales attendant (DOT 299.677-010), all light occupations.  AR 25-26.  The ALJ concluded that Plaintiff was not disabled. AR 26.

## II.

## ISSUES PRESENTED

Issue One:  Whether the ALJ erred in evaluating the medical opinion evidence about Plaintiff's mental impairments from Dr. Shuhaibar.  (Dkt. 21, Joint Stipulation ["JS"] at 3, 13-19.)

Issue Two:  Whether the ALJ erred by failing to give specific, germane reasons for discounting the Third Party Statement of Plaintiff's daughter, Nicole F. (AR 249-56).  (JS at 3, 27.)

Issue Three:  Whether the ALJ erred by failing to consider Plaintiff's cardiac or cervical spine impairments at steps two through four.  (Id. at 3, 32.)

Issue Four:  Whether the ALJ erred by failing to give clear and convincing reasons for discounting Plaintiff's subjective symptom testimony.  (Id. at 3, 39.)

# III.

## DISCUSSION

The Court will discuss the issues out of order to track the sequential evaluation process for disability benefits eligibility determinations.

### A. ISSUE ONE: Dr. Shuhaibar's Opinion.

#### 1. Relevant Evidence.

##### a. Treating Records.

Plaintiff initially saw Dr. Jasmin Villatoro at Central City Community Health Center to treat his physical issues. AR 519. She referred him to psychiatrist Dr. Lina Shuhaibar for his "acute stress and anxiety." AR 525. Plaintiff's initial appointment with Dr. Shuhaibar occurred on January 26, 2016. AR 507. Dr. Shuhaibar noted his subjective complaints, including aggression, anxiety, stress caused by conflict with a neighbor, financial worries, and recent family deaths. AR 507-08, 526. She conducted a depression screening and assessed that Plaintiff had "mild depression." AR 507. She observed that his mood seemed "depressed" and "anxious." AR 508. Plaintiff reported a "poor" appetite and sleep, but the other aspects of his mental status examination were average or fair. AR 508-09. She started him on Celexa/citalopram, an antidepressant, and Ativan/lorazepam for anxiety. AR 507.

At his next appointment on February 9, 2016, Plaintiff reported that things were "going much better"; he had an "improved mood" and sleep, "no aggression," and "eats well" since starting Celexa. AR 504. He did not need to take lorazepam for anxiety after the initial dose two weeks earlier. Id. His mental status examination noted a "stable, happy" mood and "no" disturbance to sleep or appetite. AR 505. Dr. Shuhaibar rated the efficacy of his treatment "fair to good." Id.

On February 23, 2016, Plaintiff confirmed he was still taking Celexa but not lorazepam. AR 502. He denied aggression and was "less irritable and anxious."

3

1  Id.  Dr. Shuhaibar assessed his mood as "stable, improved overall, but still
2  depressed and anxious at times."  AR 503.  Otherwise, his mental status
3  examination was similar to before.  Id.

4      On March 8, 2016, Plaintiff reported anxiety, bad dreams, and financial
5  worries, but he still had not taken more lorazepam.  AR 500.  He denied
6  aggression, and his mental status examination reflected a "stable, neutral" mood
7  with other factors largely unchanged.  AR 500-01.

8      On March 29, 2016, Plaintiff reported becoming "extremely agitated" that
9  morning due to a gardener's noisy leaf blower, but by the time of his appointment,
10  he rated his mood as 7/10 (10 being best).  AR 498-99.  Dr. Shuhaibar noted that
11  he should "work on coping skills."  AR 498.  He was still sleeping and eating
12  "OK," and his treatment efficacy was still "fair to good."  AR 498-99.

13     On April 26, 2016, Plaintiff felt angry with his neighbor and reported feeling
14  "more depressed and hopeless than before."  AR 496.  He complained of anxiety
15  and mood swings, but continued not to take lorazepam.  Id.  Per his mental status
16  examination, Dr. Shuhaibar assessed a "stable" mood with the other factors (all
17  fair, average, or sufficient) unchanged.  AR 496-97.

18     By May 31, 2016, Plaintiff felt "OK" and "less" anxious and depressed, but
19  he still reported some feelings of depression and hopelessness.  AR 494.  Again,
20  his mental status examination was unremarkable, and the efficacy of his treatment
21  was "fair to good."  AR 495.

22     On June 28, 2016, Plaintiff reported having a rough week because he forgot
23  to take his Celexa with him on a three-day fishing trip.  AR 492.  He was also
24  feeling increased depression due to pain and a reduced ability to help his elderly
25  mother following carpal tunnel release surgery on June 24.  AR 492, 566.  His
26  mental status examination was unchanged.  AR 492-93.  His follow-up
27  appointments were rescheduled from monthly to every three months.  AR 492.

28     On September 27, 2016, he continued to report conflict with his neighbor

4

and a depressed mood, but he was sleeping and eating "OK." AR 490. His mental status examination was unremarkable. AR 490-91.

In October 2016, Dr. Villatoro conducted another depression screening and again assessed "mild depression." AR 570, 574-75. She occasionally conducted mental status examinations, all of which revealed no remarkable findings. AR 532, 576, 578.

On December 27, 2016, Plaintiff was still "doing OK" although he had argued with an electrician. AR 488. His mental status examination was unchanged. AR 488-89. He was still taking the same does of Celexa and not taking lorazepam. AR 488. Dr. Shuhaibar still rated the efficacy of his treatment as "fair to good." AR 489.[2]

Plaintiff did not have access to Celexa or his other medication in January 2017, because he was incarcerated after an altercation with his neighbor.[3] AR 591, 649, 713. He returned to see Dr. Shuhaibar on May 23, 2017. AR 586. At that time, he was prescribed the same 20 mg dosage of Celexa/citalopram with the same mental status examination results. AR 586-87.

In June 2017, Dr. Shuhaibar increased his Celexa/citalopram dosage from 20 mg to 40 mg. AR 588. Plaintiff continued to feel "anxious, nervous, depressed." Id. Dr. Shuhaibar observed a stable mood, coherent thoughts, regular speech, and appropriate affect. AR 588-89.

By September 2017, Plaintiff was "[s]table and improved, doing well

_____

[2] Per the facsimile transmission header, these records were faxed to the SSA on March 15, 2017.

[3] Plaintiff reported that he was "arrested by neighbor, provoked by them, [and he] damaged their car after neighbor hit his car. [He] says he's unable to move houses from neighborhood, highly hispanic, provoking patient. . . . [N]ow on probation for defending his property, incarcerated for 30 days, and has to pay over $6000 in damages for probation." AR 586.

overall." AR 599.  He stopped taking Celexa regularly.  Id. (noting regarding Celexa "not taking/PRN [as needed]").  Dr. Shuhaibar continued to rate the efficacy of his treatment as "fair to good."  AR 600.

After stopping Celexa, Plaintiff's depression worsened.  A November 2017 depression screening conducted by Dr. Villatoro resulted in an assessment of "severe depression," due in part to bad memories from his incarceration, problems with his girlfriend, and increased financial stress.  AR 605-06.  Plaintiff's mental status examination, however, was not much changed.  AR 607.

In December 2017, Dr. Shuhaibar prescribed Xanax/alprazolam to treat Plaintiff's increased anxiety.  AR 608.  Plaintiff reported experiencing two panic attacks per month, and she observed anxious behavior and motor activity.  AR 608-09.  Again, she rated the efficacy of his treatment as "fair to good."  AR 609.

In January 2018, Plaintiff reported no "neuro/psych problems" in response to a questionnaire seeking information in preparation for a GI endoscopy.  AR 670.

b.  Medical Opinion Evidence.

Dr. Shuhaibar completed a Mental Impairment Questionnaire ("MIQ") dated April 26, 2016.  AR 407-13.  Dr. Shuhaibar reported that Plaintiff was taking Celexa and experienced "some sedation" as a side effect.  AR 407; compare AR 488, 490, 492-94, 496, 498, 502, 505 (noting "patient denies side effects to medication").  As symptoms, she reported depressed mood, abnormal affect, irritability, anhedonia, appetite and sleep disturbances, and social withdrawal.  AR 408.  She also noted "difficulty thinking or concentrating."  Id.; compare AR 493, 497, 499, 501, 503, 505 (noting "fair concentration" and "logical" or "coherent" thought process); AR 532, 576, 578 (Dr. Villatoro noting "cognitive function intact").  She opined that he experienced "episodes of decompensation" and was "unable to be functional, shower, go to work … when depressed."  AR 409.  She lacked sufficient information to opine on whether Plaintiff could "understand and remember one-to-two step instructions."  AR 410.  She could, however, opine that

he had "moderate" or "moderate-to-marked" limitations in many functional areas. Id. She also opined that he would miss work more than three days/month. AR 411. She concluded by characterizing Plaintiff's depression as "moderate to severe." AR 411; compare AR 507, 570 (finding "mild" depression after depression screenings in January and October 2016).

About two months after the MIQ, on July 5, 2016, Dr. Larisa Levin conducted a consultative psychiatric examination. AR 433-37. She did not review Plaintiff's medical records, but she interviewed Plaintiff about his treating history. AR 433-34. He told Dr. Levin that "sixth months ago he was placed on antidepressants with positive results." AR 434. He denied panic attacks and sustained periods of anhedonia. Id. He told Dr. Levin that he "gets along with family, friends and neighbors." AR 435. Dr. Levin administered some basic tests of memory, cognition, and concentration. AR 435-36. She assessed a "dysphoric" mood and a Global Assessment of Functioning ("GAF") score of 54.[4] AR 436. She concluded that his depression did not cause any functional impairments. AR 437.

On July 30, 2016, state agency consulting psychologist Dr. Kevin Santulli opined that Plaintiff suffered from affective disorders that were non-severe, because they caused only mild functional limitations. AR 90-91. He further opined that Dr. Shuhaibar's MIQ was "without substantial support from other evidence of record, which renders it less persuasive." AR 95. On reconsideration in November 2016, Dr. Ida Hilliard "affirm[ed] prior psychiatric determination. Impairments are not severe." AR 107.

---

[4] A GAF score of 54 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Hernandez v. Astrue, No. EDCV 07-0022-RC, 2008 U.S. Dist. LEXIS 74771, at *2 n.4 (C.D. Cal. Aug. 15, 2008).

1

          c.  Plaintiff's Testimony.

2

       In applying for benefits, Plaintiff listed anxiety and depression as conditions

3

that limit his ability to work.  AR 217.  In April 2016, Plaintiff completed a

4

Function Report.  When asked how his conditions limited his ability to work, he

5

mentioned only physical impairments.  AR 228.  At that time, he could drive, go

6

shopping, and go camping twice a year.  AR 231-32.  He attributed his occasional

7

difficulty understanding others to his hearing impairment, not cognitive

8

impairment.[5]  AR 233-34.  He was taking Celexa (20 mg dose) and reported that it

9

caused drowsiness and loss of appetite.  AR 235.

10

       At the February 2018 hearing, Plaintiff testified that he dealt with symptoms

11

of depression and anxiety by getting away and going to the lake to fish and relax.

12

AR 62.  He experienced panic attacks twice per month AR 62-63.  Nevertheless,

13

his medication "takes the edge off" and "calms [him] down a lot."  AR 70.

14

### 2.  The ALJ's Treatment of Plaintiff's Mental Impairments.

15

       The ALJ determined that at worst, Plaintiff's depression and anxiety caused

16

only "mild" functional limitations.  AR 18.  As evidence, the ALJ cited Dr.

17

Shuhaibar's mental status examinations which consistently showed "fair"

18

judgment, insight, memory, and concentration; his lack of treating history for

19

mental health issues other than his treatment with Dr. Shuhaibar; his activities of

20

daily living; and his reports of improvement with treatment.  Id.

21

       The ALJ gave "great weight" to the findings of Drs. Santulli and Hilliard as

22

"consistent with the longitudinal record," again citing Dr. Shuhaibar's treating

23

records.  Id.  The ALJ gave "partial weight" to Dr. Levin's report, explaining that

24

"little weight" was given to the GAF score, but concluded that Dr. Levin's opinion

25

of "no limitations is consistent with the longitudinal record."  AR 19.

26

       The ALJ gave "little weight" to Dr. Shuhaibar's MIQ.  Id.  The ALJ

27

---

28

[5] Plaintiff was encouraged to wear hearing aids.  AR 573.

reasoned that the MIQ must reflect Plaintiff's subjective complaints since it differed significantly from Dr. Shuhaibar's treating records, which reflected a "stable and improving mood" and "fair" judgment, insight, concentration, and memory. Id.

### 3. Rules Governing Evaluation of Conflicting Medical Opinions.

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Turner v. Comm'r of SSA, 613 F.3d 1217, 1222 (9th Cir. 2010) (citation omitted).  This rule, however, is not absolute.  "Where . . . a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citation omitted).

### 4. Analysis of Claims Error.

ALJs may discount the opinions of a treating physician which differ from that doctor's own treating records.  See Batson v. Comm'r of SSA, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit treating physician's opinion that is unsupported by medical findings).

Here, the ALJ cited conflicts between Dr. Shuhaibar's MIQ and her treating records regarding her assessment of Plaintiff's concentration and memory.  AR 19. In the MIQ, Dr. Shuhaibar assessed that Plaintiff had "difficulty thinking or concentrating."  AR 408.  She found he had "moderate" limitations maintaining concentration for extended periods.  AR 410.  In her treating records, however, Dr. Shuhaibar consistently assessed "fair" concentration.  AR 493, 497, 499, 501, 503, 505.  In the MIQ, she represented that she lacked sufficient information to assess whether Plaintiff could remember basic information like "locations" and "one-to-two step instructions."  AR 410.  In her treating records, however, she consistently

9

1    assessed that Plaintiff had a "fair" memory. AR 493, 497, 499, 501, 503, 505.

2    Thus, the ALJ cited a legally sufficient reason, supported by substantial evidence,

3    to discount Dr. Shuhaibar's MIQ.[6]

4    **B. <u>ISSUE THREE: The ALJ's Consideration of Other Impairments.</u>**

5         Plaintiff applied for disability benefits alleging that his ability to work was

6    limited by impairments including spinal impair ents (i.e., "bulging disc injury,"

7    "lumbar spine impairment," and "severe back pain") and cardiovascular

8    impairments (i.e., bypass surgery, congestive heart failure, coronary artery disease,

9    and high blood pressure). AR 217.

10        Plaintiff contends that the ALJ erred by failing to analyze whether Plaintiff's

11   cardiac impairments or cervical spine radiculopathy (1) were severe at step two;

12   (2) equaled a listed impairment at step three; or (3) merited inclusion of some

13   functional restriction in the RFC at step four. (JS at 32.) Plaintiff further contends

14   that this failure is not subject to a harmless error analysis. (<u>Id.</u> at 37-38 [arguing no

15   one can "presume that had the ALJ properly considered these impairments and/or

16   that the RFC and hypothetical questions would not have changed"].)

17        As a threshold issue, Defendant argues that Plaintiff waived these claims of

18   error by failing to raise them during administrative proceedings. (<u>Id.</u> at 36.)

19   Specifically, Defendant argues that if Plaintiff believed that his heart disease or

20   cervical spinal impairments caused functional limitations greater than those

21   included in the ALJ's hypothetical question to the VE, then counsel was required

22

23        [6] In briefing this issue, Plaintiff includes the argument that the ALJ should
     have found that his mental impairments were severe. (<u>See</u> JS at 13.) It was
24   Plaintiff's burden to show that these impairments had more than a minimal effect
     on his ability to work. <u>See</u> <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998).
25   Having appropriately discounted Dr. Shuhaibar's MIQ, Plaintiff points to no other
     medical opinion evidence or treating records which suggest that his mental
26   impairments caused more than "mild" functional limitations. Plaintiff has failed to
     show legal error affecting the ALJ's step two analysis of his mental impairments.
27

28

to identify those limitations either though questions to the VE or his request for Appeals Council review.  (Id.)

### 1. The ALJ's Duties in the Sequential Evaluation Process.

#### a. Step Two.

At step two, the ALJ must decide whether the claimant suffers from any medically determinable severe impairments or a combination of impairments that is severe.  20 C.F.R. § 404.1520(c).  To establish the existence of a medically determinable impairment, the claimant must provide medical evidence consisting of "signs—the results of 'medically acceptable clinical diagnostic techniques,' such as tests—as well as symptoms," a claimant's own perception or description of his physical or mental impairment.  Ukolov v. Barnhart, 420 F.3d 1002, 1005 (9th Cir. 2005).  The burden is on the claimant to prove that an impairment is "severe," meaning that he must show that an impairment causes more than a minimal effect on his ability to work.  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).

Omissions at step two are often harmless error if the claimant has at least one severe impairment, because the ALJ must consider the functional limitations, if any, caused by all of the claimant's impairments in determining the claimant's RFC.  Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005).  If the ALJ fails to discuss an impairment at step two, any error is harmless unless there is evidence that the impairment limited the claimant's ability to work and those limitations were not considered in the RFC.  See, e.g., Clark v. Berryhill, No. 17-cv-00371-JCS, 2018 U.S. Dist. LEXIS 130156, at *80 (N.D. Cal. Aug. 2, 2018) (holding that ALJ's failure to discuss mood and personality disorders at step two was harmless error where the ALJ discussed the medical evidence diagnosing those conditions at step four and considered that evidence when determining the RFC); Phillips v. Berryhill, No. 3:16-cv-00226-LRH-WGC, 2017 U.S. Dist. LEXIS 114855, at *23 (D. Nev. July 24, 2017) (holding ALJ's failure to discuss sleep apnea at step two or accommodate fatigue in the RFC was not error, because there was insufficient

11

evidence to show that the claimant's sleep apnea "limited his ability to function in a work setting").

b.   Step Three.

At step three, the ALJ must determine whether a claimant's impairments meet or equal one of the listed impairments; if so, they presumptively preclude substantial gainful activity and, therefore, render the claimant disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. part 404, subpart P, appendix 1.  Although a claimant has the burden of proving disability at step three, an ALJ must still adequately discuss and evaluate the evidence before concluding that a claimant's impairments fail to meet or equal a listing.  See Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001) ("An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment.").  Remand is appropriate where an ALJ fails adequately to consider a listing that plausibly applies to a claimant's case.  Id.  In contrast, "an ALJ does not err by failing to address whether the claimant's combination of impairments medically equals a Listing where the claimant offers no plausible theory as to how her impairments equal a listed impairment."  Doto v. Berryhill, No. 17-cv-01120-VKD, 2018 U.S. Dist. LEXIS 168347, at *36 (N.D. Cal. Sep. 28, 2018) (citing Lewis).

c.   Step Four.

At step four, the ALJ must compare the demands of the claimant's past relevant work to the claimant's RFC.  20 C.F.R. § 404.1520(a)(4)(iv).  The ALJ must determine the claimant's RFC based on all impairments supported by substantial evidence, including impairments that are not severe.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(2).  Non-severe impairments, however, will rarely change an RFC, since by definition, non-severe impairments do not limit a claimant's ability to do work-related tasks more than minimally.

12

1

**2. Analysis.**

2

a. Cervical Spine Impairments

3   Plaintiff waived all of his arguments with respect to his cervical spine

4   impairments.  Represented claimants generally must raise all issues and evidence

5   before the Commissioner "in order to preserve them on appeal."  Meanel v. Apfel,

6   172 F.3d 1111, 1115 (9th Cir. 1999) (as amended); accord Shaibi v. Berryhill, 883

7   F.3d 1102, 1109 (9th Cir. 2017).[7]  A claimant waives a claim of step-two error by

8   raising the argument for the first time to the district court, if evidence in the record

9   regarding those conditions was insufficient to put the ALJ and the Appeals Council

10  on notice that the conditions constituted impairments.  Harshaw v. Colvin, 616 F.

11  App'x 316, 316 (9th Cir. 2015); compare Cook v. Berryhill, No. 17-cv-00004-

12  RMI, 2018 U.S. Dist. LEXIS 24537, at *13 (N.D. Cal. Feb. 14, 2018) ("The court

13  finds that Plaintiff sufficiently raised the issue of vertigo in her pre-hearing

14  briefing to the ALJ in order to trigger an analysis under Step Two, and at

15  subsequent steps if necessary.").

16  In his function and disability reports (AR 228, 278-79) and pre-hearing brief

17  (AR 336), Plaintiff mentioned only the lumbar spine.  He complained only of

18  lower back pain and impairments at the hearing.  AR 56.  After the ALJ's decision,

19  Plaintiff knew that the ALJ had not identified cervical radiculopathy as a medically

20  determinable impairment.  Plaintiff could have flagged this alleged error for

21

22  [7] The Court notes the Supreme Court's ruling in Sims v. Apfel, 530 U.S. 103

23  (2000) that Social Security claimants may bring issues before a reviewing court
    that were not raised before the Appeals Council.  The holding in Sims clarified that

24  claimants need not present issues they raised to the ALJ in a request for review to
    Appeals Council in order to preserve judicial review of those issues.  Sims, 530

25  U.S. at 104-05.  However, the Supreme Court specifically noted that it was not
    deciding "[w]hether a claimant must exhaust issues before the ALJ."  Id. at 107.

26  As such, Sims did not disturb Meanel's holding that issues generally must be

27  raised at some point before the administrative agency.  See Harshaw v. Colvin, 616
    F. App'x 316, 316 (9th Cir. 2015).

28

13

consideration by the Appeals Council, at which point the Appeals Council might have remanded the case for reconsideration by the ALJ.  Instead, Plaintiff filed a superficial request for Appeals Council review that does not identify any errors (AR 185, stating reason for review as, "My disabling condition continues and I am unable to sustain gainful work activity") and now argues that he should suffer no adverse consequences for having treated the Appeals Council process as a meaningless, pro forma requirement.

Requiring (via imposition of waiver) claimants to identify to the Appeals Council alleged errors of omission in an ALJ's decision with enough specificity to afford the Appeals Council a meaningful opportunity to address them would be far more efficient than allowing what happened here—i.e., Plaintiff's counsel submitted a 1-sentence argument to the Appeals Council followed by a lengthy brief to the district court.

Even without waiver, however, the Court would find that the ALJ did not err at step two (or, by extension, at subsequent steps) in evaluating Plaintiff's cervical impairments.  There is no evidence that Plaintiff's cervical impairment had more than a minimal effect on his ability to work.  The ALJ summarized numerous examinations showing a normal range of back motion and normal cervical spine x-rays.  AR 20-22; see also AR 427, 575, 647, 722, 724-25.  Plaintiff points to an April 2016 nerve conduction study that found "cervical radiculopathy at C5-C6, a little bit more on the L" and recommended an MRI of the cervical spine.  (JS at 4-5, citing AR 45-56.)  He also points to 2017 chiropractic notes documenting "spinal enthesopathy, cervical region"[8] and "pain and restriction in neck and lower

---

[8] "Tendons are the tissues that attach your muscles to your bones. Ligaments are what attach your bones to one another.  The place where a tendon or ligament meets your bone is called an enthesis. … Enthesopathy is an umbrella term for conditions that affect these connection points."  See https://www.webmd.com/arthritis/psoriatic-arthritis/enthesitis-enthesopathy.

back" with "limited range of motion with stiffness."  (JS at 7, citing AR 593-4, 601-03.)  The medical evidence, however, also includes (1) June 2015 treating records from Scosi Orthopedics/Dr. Allen Lu assessing only lumbar disc disease (AR 511); (2) Dr. Lim's June 2016 consultative examination noting a "history of neck and back" pain with a "mildly decreased range of motion of the neck" but finding that Plaintiff could do light work (AR 416-20); (3) another June 2016 record noting "supple" neck and no back tenderness (AR 483); (4) physical therapy records for "lower back" pain (AR 355); and (5) Dr. Schoene's March 2018 consultative examination at which Plaintiff's "cervical spine range of motion [was] normal."  AR 722.  Dr. Schoene ordered x-rays of Plaintiff's cervical spine and interpreted them as "normal."  AR 724.  Looking at the record as a whole, substantial evidence supports the ALJ's determination that Plaintiff's cervical impairments were not severe.

b.  Cardiac Impairments.

Plaintiff has waived his step-three cardiac impairment claim.  He has failed to identify any potentially applicable listing – either in his pre-hearing brief, at the ALJ hearing, or in his request for Appeals Council review – let alone explain how the medical evidence satisfies each requirement of those Listings.  See Salerno v. Astrue, 266 F. App'x 570, 572 (9th Cir. 2008) ("It is the claimant's burden … to specify which listing he meets or equals and set forth evidence that would support the diagnosis and finding of a listed impairment."); Harris v. Berryhill, 738 F. App'x 529, 531 (9th Cir. 2018) ("Because Harris was represented by counsel during the administrative proceedings, she waived any contention that the ALJ failed to consider Listing 12.05(C), Intellectual Disability, by failing to raise the issue before either the ALJ or the Appeals Council.").  Indeed, Plaintiff has not briefed to this Court how he satisfies any Listing, thereby providing a separate basis to find waiver.  Chase v. Colvin, No. 4:13-cv-01816-KAW, 2014 U.S. Dist. LEXIS 128206, at *26-27 (N.D. Cal. Sep. 12, 2014) ("[A]s Plaintiff has not argued

1   how she might equal the listing, she has waived any such argument." (citing

2   Schlegel v. Wells Fargo Bank, N.A., 720 F.3d 1204, 1210 n.4 (9th Cir. 2013)

3   (assertions unsupported by argument deemed waived))).

4        Plaintiff has not, however, waived his step-two or step-four arguments.

5   Plaintiff submitted a pre-hearing brief arguing that he had severe impairments that

6   included "congestive heart failure."  AR 336.  Plaintiff and the ALJ discussed

7   Plaintiff's heart condition at the hearing, AR 59-61, and the evidence of record

8   contains records showing prior heart attacks, surgical stent placement,

9   prescriptions for multiple medications, and appointments with a cardiologist.  See

10  AR 488-89, 353, 525, 530,  613-15, 417, 426, 482, 440, 418, 483, 560, 590, 349-

11  50, 511.  In her decision, the ALJ acknowledged Plaintiff's testimony regarding

12  congestive heart failure and that he experiences dizziness, which he attributes to

13  blocked arteries.  AR 21.  At step two, however, the ALJ did not identify heart

14  disease as a medically determinable impairment.

15       Plaintiff has failed to show any prejudicial legal error.  The medical

16  evidence shows that Plaintiff suffered heart attacks in 2003 and 2007, followed by

17  stent placement.  AR 488-89.  In January and February 2016, Plaintiff was taking

18  Zetia/ezetimibe to lower cholesterol and other heart-related medications.  AR 353,

19  525.  In February 2016 he reported "random chest pain" and was referred to see a

20  cardiologist, Dr. Prakash Patel.  AR 530; AR 613 (notes from March 2016

21  appointment with Dr. Patel).  Plaintiff treated with Dr. Patel from March 2016

22  through September 2017; Dr. Patel diagnosed hypertension, stable angina,

23  coronary artery disease with stent to the right coronary artery, and hyperlipidemia.

24  AR 613-15.  By December 2016, Dr. Patel assessed his heart condition as "stable"

25  with medications.  AR 614 ("No chest pain, palpitation.").

26       Over the course of his medical appointments, Plaintiff's doctors encouraged

27  him to do 20-30 minutes of cardio exercise 2-3 time/week.  AR 534; AR 574, 605

28  (exercise recommendation increased).  In April 2016, "unremarkable" chest x-rays

revealed Plaintiff had normal vascularity and cardiac silhouette.  AR 373.  In June 2016, Plaintiff reported "on and off chest pain" and shortness of breath.  AR 416. He was taking metoprolol and lisinopril (for high blood pressure), amlodipine (a calcium channel blocker than can treat chest pain), and aspirin.  AR 417, 426, 482. In October 2016, he was taking similar heart medications.  AR 440.  At various times, he had a regular heart rhythm.  AR 418, 483, 560.

In June 2017, Plaintiff reported monthly episodes of chest tightness.  AR 590.  He was encouraged to return to Dr. Patel.  Id.  In June 2015, August 2016, December 2016, and September 2017, Plaintiff denied chest pain.  AR 349-50, 511, 614-15.

In 2015, Plaintiff was urged to quit smoking.  AR 510.  In 2016, Plaintiff endorsed smoking a pack of cigarettes or more and medical marijuana daily.  AR 426, 479, 549, 614, 647 (smoking 2 packs/day until January 2017 arrest).  In 2016 and 2017, he was "highly encouraged" to quit but was "unmotivated."  AR 561, 605.  By March 2018, he was still smoking a pack per day and marijuana.  AR 721.

The state medical consultants did not list Plaintiff's heart condition as an impairment.  AR 90, 106.  Consultative examiner Dr. Lim, however, considered Plaintiff's history of heart disease in reaching his opinions about Plaintiff's functional abilities.  AR 419-20.  So did Dr. Schoene.  AR 721.

At the hearing, Plaintiff testified that his chest pain and tightness is caused by esophageal reflux.  AR 59.  He testified that he could not climb stairs at all because he would "get winded."  AR 60.  The ALJ asked about his "heart condition."  AR 60.  Plaintiff explained that he had his first heart attack in 2003, which is why he "always think[s] chest pain is [his] heart."  Id.  When asked about his more recent "cardiac conditions," Plaintiff testified that he was experiencing episodes of dizziness.  AR 61.

Plaintiff contends that had the ALJ considered his heart disease, she may have found that he had functional limitations not reflected in either her RFC

determination or hypothetical to the VE.  (JS at 33.)  In support, Plaintiff cites <u>Hill</u> <u>v. Astrue</u>, 698 F.3d 1153, 1161 (9th Cir. 2012).  (<u>Id.</u>)

In <u>Hill</u>, when determining the claimant's RFC, the ALJ considered the functional limitations caused by some of the claimant's mental MDIs, but failed to consider one MDI: panic disorder.  <u>Hill</u>, 698 F.3d at 1161.  Citing the Index of Psychiatric Disorders, Diagnostic and Statistical Manual of Mental Disorders, the Ninth Circuit determined that the claimant's panic disorder had symptoms not associated with her other mental impairments, such as "an intense fear that leaving the safety of home feels impossible."  <u>Id.</u>  Thus, the claimant's panic disorder could create a functional limitation in the form of inability to maintain regular attendance or complete a normal workday/workweek.  <u>Id.</u> at 1162.  The ALJ, however, failed to include such a limitation in the RFC or hypothetical question to the VE.  As a result, the ALJ's hypothetical question to the VE was incomplete, and the VE's answer was not substantial evidence supporting the ALJ's step-five findings.  <u>Id.</u>

<u>Hill</u> is inapposite.  Regarding his heart disease, Plaintiff contends that it limits his ability to engage in prolonged walking or climb stairs without becoming winded.  (JS at 32.)  He argues that failing to consider his heart disease caused the ALJ to assess an RFC that overstated Plaintiff's abilities by finding that he could walk for about 6 hours/day and climb ramps or stairs up to 2/3 of his workday.

Even if the Plaintiff's heart impairment were a severe MDI that limited his ability to climb ramps or stairs, any error in this regard would be harmless.  <u>See</u> <u>Burch</u>, 400 F.3d at 682 (noting that step two error could only prejudice plaintiffs at step three or in applying the RFC if the other steps are resolved in the claimant's favor).  Plaintiff's past relevant work as a construction superintendent does not require postural activities such as climbing.  <u>See</u> DOT 182.167-026 ("Climbing: Not Present – Activity or condition does not exist").  Plaintiff fails to identify any other functional limitations attributable to his heart disease apart from limits on his

walking, an exertional ability that the ALJ thoroughly considered, finding that Plaintiff could walk for 6 hours per day after considering reports from two consultative examiners.  AR 23.  These consultative examiners discussed Plaintiff's history of heart attacks and current heart-related medications and diagnosed "coronary artery disease" or "cardiac arteriosclerosis," but they nevertheless opined that he could walk 6 hours per day.  AR 23, 419-20, 721, 724.  Plaintiff claimed that he was incapable of walking even a block without needing to sit down, AR 59-60, but the ALJ discounted his testimony, AR 22, a finding Plaintiff challenges unsuccessfully (see below).  There is simply no evidence in the record that the ALJ would or should have assessed greater limitations on Plaintiff's walking due to his cardiac impairments.  See Stout v. Commissioner of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is inconsequential to the ultimate nondisability determination).

## C. **ISSUE FOUR: Plaintiff's Subjective Symptom Testimony.**

The ALJ found that Plaintiff's testimony concerning "the intensity, persistence, and limiting effects" of his symptoms was "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  AR 22.  As supporting reasons, the ALJ cited (1) lack of support from "objective findings"; (2) inconsistency "with the medical evidence of record"; (3) Plaintiff's independence in conducting activities of daily living; and (4) conservative treatment.  AR 22-24.

### 1. **Reason One**: Lack of Supporting Objective Evidence.

While a claimant's subjective statements about symptoms "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor."  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

In support of this reason, the ALJ noted MRIs and x-rays showing normal conditions or mild degenerative changes.  AR 24, citing AR 438-85, 720-27.  The

ALJ also noted physical examinations during which Plaintiff displayed a full range of back or wrist motion, 5/5 strength, good grip strength, a normal gait, and other normal findings.  AR 22-24, citing AR 342-52, 510-12, 438-85.

### 2. <u>Reason Two</u>: Inconsistency with Treating Records.

For Plaintiff's physical impairments, the evidence cited in support of reasons one and two are the physical examinations noted above.  This is a separate and distinct reason for discounting Plaintiff's claims.  See <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1434 (9th Cir. 1995) ("The ALJ also identified several contradictions between claimant's testimony and the relevant medical evidence and cited several instances of contradictions within the claimant's own testimony. . . .  Lastly, the medical records discredit claimant's assertion that her condition had not changed since 1983.").

Plaintiff also claimed to be disabled due to anxiety and depression.[9]  AR 217.  The ALJ found that Dr. Shuhaibar's MIQ (which opined that Plaintiff had disabling mental impairments, consistent with Plaintiff's allegations) were inconsistent with her "actual examinations," and the Court agrees that Plaintiff's testimony conflicts with Dr. Shuhaibar's examination findings.  AR 19.

### 3. <u>Reason Three</u>: Independent Activities of Daily Living.

The ALJ noted that Plaintiff could "go to doctors['] appoint[ments], bathe and dress himself, drive a vehicle, go shopping and go fishing."  AR 24.  The ALJ also explained in the step two analysis that Plaintiff's mental impairments did "not

---

[9] Plaintiff argues that the ALJ's evaluation of his subjective symptom testimony focused solely on his physical conditions.  (JS at 16.)  ALJs, however, need not organize their decisions in any particular way so long as the reviewing Court can understanding their reasoning.  See <u>Glenn v. Comm'r of SSA</u>, No. CV-16-04268-PHX-DGC, 2017 WL 4349394, at *3 (D. Ariz. Oct. 2, 2017) ("Although the ALJ's opinion could have been organized more clearly to highlight its specific reasons, they are identified in the decision.").

appear to have a great impact on the claimant's activities of daily living.  Rather, his activities … are more widely affected by his physical conditions."  AR 18.

Regarding medical appointments, Plaintiff not only attended his own but also drove his mother to all her doctor appointments and got her medications, because she "can't walk very much."  AR 64, 229, 434.  He drove about 30 minutes to attend the hearing.  AR 65.  He drove to Dr. Lim's consultative examination.  AR 417.  Because his car was in disrepair, he had to "stop every four or five miles and put a pit of water" in it.  AR 66.  He could use a TomTom navigation system.  Id.  Plaintiff was responsible for all the household shopping, because his adult daughter did not leave their house.  AR 63-64.  To generate money, he rented a space at a swap meet and sold his tools.  AR 68.  He mostly prepared his own meals.  AR 64-65.  He took a three-day fishing trip in 2016 and last fished in September 2017.  AR 67, 492, 594.  He regularly went outside to smoke.  AR 231.

Plaintiff argues that this level of activity is not inconsistent with his claimed limitations.  (JS at 42.)

Plaintiff, however, testified that due to carpal tunnel syndrome, his hands were "gone.  They don't work like.  Anything I do, I stir my coffee in the morning. … my fingers lock up."  AR 52.  He could not grasp a gallon of milk and pour from it without pain.  AR 53.  He testified, "Everything I do is a problem."  AR 56; see also AR 228 ("Constant problems with hands and arms.  Very painful.  Fingers all cross over each other and lock up.").  This testimony asserting an inability to use his hands or lift household items is inconsistent with independently driving, shopping, and bathing.

Regarding his mental impairments, Plaintiff testified, "Everything bothers me," including people.  AR 62.  He claimed that anxiety limited his ability to work.  AR 217.  This is inconsistent with his testimony that he could go out in public alone to do most household errands and take care of his mother.  While he claimed

1    to have work-precluding limitations on concentration, memory, completing tasks,

2    understanding, and following instructions (AR 233), that testimony is inconsistent

3    with being able to shop (which requires understanding which goods to select,

4    completing the check-out process, interacting with store staff, and using money)

5    and drive (which requires remembering traffic rules, responding to traffic patterns,

6    and maintaining attention) frequently and independently.

7            **4.  <u>Reason Four</u>: Conservative Treatment.**

8            Regarding his spinal impairments, the ALJ noted, "The claimant treated

9    conservatively with medication and chiropractic manipulation only and there is no

10   indication in the record suggesting future surgical intervention."  AR 22.

11          In 2015, Plaintiff complained to Dr. Lu of "chronic back pain with an

12   intensity of 10/10 and he takes Norco as needed."  AR 349.  He also listed

13   gabapentin and ibuprofen as pain medications.  AR 349, 519.  He only took that

14   gabapentin as needed, "not regularly."  AR 502.  Dr. Lu wrote, "[d]iscussed

15   conservative treatment options i.e. pain medication, cortisone injection.  Patient

16   desires to manage the pain by taking medication now." AR 351; <u>see also</u> AR 519

17   ("No surgery has been offered yet and patient held off cortisone injections.").

18          At his 2016 consultative examination, Plaintiff did not identify any pain

19   medications that he was taking, other than aspirin to treat his heart condition.  AR

20   417.  Later in 2016 and mid-2017, he took Tylenol with codeine.  AR 573, 588.

21          In August and September 2017, Plaintiff received chiropractic treatment.

22   AR 593-603.  By September 2017, he was no longer taking Tylenol with codeine

23   or any other prescription pain medication.  AR 593, 599.

24          At his 2018 consultative examination, he identified taking ibuprofen and

25   codeine.  AR 721.  At the hearing, Plaintiff testified, "I have a lot of medications

26   for everything, and I don't like taking medication, but – I only take what I have to

27   take."  AR 54.  He was taking Tylenol 3, and that helped with pain.  <u>Id.</u>  He also

28   used a heating pad twice a month.  AR 58.

The ALJ's characterization of this treatment history as more "conservative" than one would expect for a person disabled by spinal impairments is supported by substantial evidence.  Neither party has cited in the record any surgical recommendations, referrals for specialized pain management, injections, acupuncture, or other kinds of treatment for back pain.

**D. ISSUE TWO: Nicole F.'s Function Report.**

Plaintiff's daughter Nicole F. submitted a Function Report dated April 18, 2016.  AR 249-56.  Her Function Report is similar to the one completed by Plaintiff.  Compare AR 228-36 and AR 246-56.

When rejecting lay witness testimony, an ALJ must give specific reasons germane for discounting the testimony.  Valentine v. Commr. SSA, 574 F.3d 685, 694 (9th Cir. 2009).  The ALJ did not address Nicole's Function Report. Defendant argues this is harmless error, citing Molina v. Astrue, 674 F.3d 1104, 1117 (9th Cir. 2012) ("Where lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with [the Ninth Circuit's] prior harmless error precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se.").  (JS at 30.)

Here, the lack of supporting objective evidence, conservative treatment, and inconsistency with Plaintiff's activities cited by the ALJ to discount Plaintiff's testimony also provide germane reasons to discount Nicole's Function Report. Thus, any error was harmless.  See Molina, 674 F.3d at 1117.

/ / /

/ / /

/ / /

/ / /

/ / /

## IV.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.

DATED:  July 30, 2020                    _____

KAREN E. SCOTT
United States Magistrate Judge